CASE NO. 24-5859

———————————————————————————————

## UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

———————————————————————————————

**UNITED STATES OF AMERICA**
Plaintiff-Appellee

v.

**AMADOR MAGALLON GUERRERO**
Defendant-Appellant

On Appeal from the United States District Court
for the Middle District of Tennessee, Nashville Division
William L. Campbell, Jr., Chief U.S. District Judge, No. 3:19-cr-118

———————————————————————————————

**BRIEF OF APPELLEE UNITED STATES OF AMERICA**

———————————————————————————————

**ROBERT E. McGUIRE**
**Acting United States Attorney**
**Middle District of Tennessee**

**EMILY PETRO**
**MICHAEL TACKEFF**
**Assistant United States Attorneys**
**719 Church Street, Suite 3300**
**Nashville, Tennessee 37203**
**(615) 736-5151**

**Attorneys for Plaintiff-Appellee**

# **TABLE OF CONTENTS**

Page(s)

TABLE OF AUTHORITIES .................................................................... iv

STATEMENT REGARDING ORAL ARGUMENT ........................................... ix

STATEMENT OF JURISDICTION........................................................1

STATEMENT OF THE ISSUES...........................................................2

STATEMENT OF THE CASE..............................................................3

    A. Offense Conduct..............................................................3

    B. Procedural History..........................................................3

        i. Indictment ..............................................................3

        ii. Motions to Suppress .................................................4

        iii. Suppression Hearing...............................................5

        iv. The District Court denies the Motion to Suppress ........... 10

        v. Trial.....................................................................12

        vi. Sentencing...........................................................13

SUMMARY OF THE ARGUMENT ....................................................14

ARGUMENT .................................................................................15

    I. Agents Did Not Violate Guerrero's Fifth or Sixth Amendment Rights
        Because he Waived Them Following valid *Miranda* Warnings ..................15

        A. Standard of Review ..............................................................15

i

B. Agents' Unwarned Interactions with Guerrero Did Not Implicate Miranda.................................................................................17

C. Agents Properly Administered *Miranda* Warnings............................ 19

D. Guerrero Voluntarily, Knowingly, and Intelligently Waived his Fifth and Sixth Amendment Rights ............................................... 23

    i. The Waiver was Implicit.......................................................... 25

    ii. The Waiver was Voluntary..................................................... 25

    iii. The Waiver was Knowing and Intelligent.............................. 26

E. The Limited Unwarned Questioning Did Not Infect the Warned Questioning ......................................................................... 29

    i. The Court Need Not Mechanically Count the *Seibert* Plurality's Factors to Resolve this Case ....................................................... 30

    ii. Even Taking the *Seibert* Factors into Account, Guerrero's Miranda Warnings were Effective............................................... 31

        a. Completeness and Detail of Initial Questioning............... 32

        b. Overlapping Content of Statements.................................. 34

        c. Timing and Setting of the First and Second Rounds ........ 35

        d. Continuity of Police Personnel ......................................... 36

        e. Degree to Which Agents' Questions Treated the Second Round as Continuous with the First Round ......................... 37

F. Any Error in Admitting Guerrero's Post-Arrest Statements was Harmless................................................................................. 38

II. The Search of Guerrero's Cellphones Did Not Violate the Fourth
Amendment......................................................................................46

    A. Standard of Review ...........................................................46

    B. Argument ........................................................... 47


CONCLUSION......................................................................57

CERTIFICATE OF COMPLIANCE...................................................58

CERTIFICATE OF SERVICE ................................................58

ADDENDUM: APPELLEE'S DESIGNATION
OF RELEVANT DISTRICT COURT DOCUMENTS ...........................................59

# TABLE OF AUTHORITIES

***Federal Cases*** <span style="float:right">**Page(s)**</span>

*Arizona v. Fulminante*,
499 U.S. 279 (1991) ..................................................................................38

*Ayers v. Hudson*,
623 F.3d 301 (6th Cir. 2010) ....................................................................39

*Berghuis v. Thompkins*,
560 U.S. 370 (2010) ..................................................................................25

*Brewer v. Williams*,
430 U.S. 387 (1977) ..................................................................................24

*Duckworth v. Eagan*,
492 U.S. 195 (1989) ........................................................................... 21, 22

*Fare v. Michael C.*,
442 U.S. 707 (1979) ..................................................................................24

*Florida v. Powell*,
559 U.S. 50 (2010) ....................................................................................22

*Garner v. Mitchell*,
557 F.3d 257 (6th Cir. 2009) ............................................................. 24, 52

*Johnson v. Zerbst*,
304 U.S. 458 (1938) ..................................................................................24

*Kotteakos v. United States*,
328 U.S. 750 (1946) ..................................................................................56

*Kovach v. United States*,
53 F.2d 639 (6th Cir. 1931) ......................................................................50

*Massiah v. United States*,
377 U.S. 201 (1964) ..................................................................................39

*Milton v. Wainwright*,
407 U.S. 371 (1972) ........................................................................... 39, 40

*Miranda v. Arizona*,
384 U.S. 436 (1966) ........................................................................ *passim*

*Missouri v. Seibert*,
542 U.S. 600 (2004) ........................................................................ *passim*

*Montejo v. Louisiana*,
556 U.S. 778 (2009) ..................................................................................24

iv

*Moran v. Burbine*,
  475 U.S 412 (1986). .........................................................................23

*Neder v. United States*,
  527 U.S. 1 (1999) ............................................................................38

*New York v. Quarles*,
  467 U.S. 649 (1984) .................................................................. 17, 18

*North Carolina v. Butler*,
  441 U.S. 369 (1979) .......................................................................50

*Patterson v. Illinois,*
  487 U.S. 285 (1988) .......................................................................24

*Pennsylvania v. Muniz*,
  496 U.S. 582 (1990) .......................................................................19

*Satterwhite v. Texas*,
  486 U.S. 249 (1988) .......................................................................39

*Schneckloth v. Bustamonte*,
  412 U.S. 218 (1973) .......................................................................55

*Taglieri v. Monasky*,
  907 F.3d 404 (6th Cir. 2018) ..................................................... 16, 28

*United States v. Al-Cholan*,
  610 F.3d 945 (6th Cir. 2010) ..................................................... 24, 27

*United States v. Ayoub*,
  498 F.3d 532 (6th Cir. 2007) ...........................................................51

*United States v. Barahona-Sales*,
  524 F. App'x 235 (6th Cir. 2013) .....................................................39

*United States v. Barrett*,
  750 F. App'x 19 (2d Cir. 2018) ........................................................55

*United States v. Blomquist*,
  976 F.3d 755 (6th Cir. 2020) ..................................................... 46, 47

*United States v. Boone*,
  245 F.3d 352 (4th Cir. 2001) ...........................................................50

*United States v. Botello-Rosales*,
  728 F.3d 865 (9th Cir. 2013) ...........................................................23

*United States v. Clayton*,
  937 F.3d 630 (6th Cir. 2019) ...........................................................21

*United States v. Clements*,
  333 F. App'x 981 (6th Cir. 2009) .....................................................19

*United States v. Crowder*,
  62 F.3d 782 (6th Cir. 1995) .............................................................52

*United States v. Dillard*,
   648 F. App'x 564 (6th Cir. 2016)........................................................56

*United States v. Gallegos-Espinal*,
   970 F.3d 586 (5th Cir. 2020)............................................................54

*United States v. Garcia*,
   834 F. App'x 134 (6th Cir. 2020)......................................................49

*United States v. Garibay*,
   143 F.3d 534 (9th Cir. 1998) ..................................................... 28, 29

*United States v. Garrido-Santana*,
   360 F.3d 565 (6th Cir. 2004)............................................................54

*United States v. Gaviria*,
   775 F. Supp. 495 (D.R.I. 1991) .......................................................50

*United States v. Gutierrez-Mederos*,
   965 F.2d 800 (9th Cir. 1992)............................................................49

*United States v. Hardy*,
   228 F.3d 745 (6th Cir. 2000)............................................................56

*United States v. Hardy*,
   586 F.3d 1040 (6th Cir. 2009) .........................................................16

*United States v. Hernandez*,
   443 F. App'x 34 (6th Cir. 2011) ................................................ 50, 53

*United States v. Heron*,
   564 F.3d 879 (7th Cir. 2009)............................................................31

*United States v. Ivy*,
   165 F.3d 397 (6th Cir. 1998)............................................................48

*United States v. Jacobs*,
   63 F.4th 1055 (6th Cir. 2023)...........................................................52

*United States v. Lester*,
   98 F.4th 768 (6th Cir. 2024).............................................................18

*United States v. Lopez-Guzman*,
   246 F. Supp. 2d 1155 (D. Kan. 2003) .............................................51

*United States v. Lucas*,
   640 F.3d 168 (6th Cir. 2011)............................................................54

*United States v. May-Shaw*,
   955 F.3d 563 (6th Cir. 2020)............................................................47

*United States v. McCraney*,
   674 F.3d 614 (6th Cir. 2012)............................................................47

*United States v. Montgomery*,
   621 F.3d 568 (6th Cir. 2010)............................................................55

*United States v. Moorehead,*
  912 F.3d 963 (6th Cir. 2019) ....................................................... 16, 47
*United States v. Pacheco-Lopez,*
  531 F.3d 420 (6th Cir. 2008) ................................................................33
*United States v. Pasquarille,*
  20 F.3d 682 (6th Cir. 1994) .................................................................47
*United States v. Patane,*
  542 U.S. 630 (2004) ............................................................................17
*United States v. Perry,*
  908 F.2d 56 (6th Cir. 1990) .................................................................16
*United States v. Ramamoorthy,*
  949 F.3d 955 (6th Cir. 2020) ....................................................... 26, 53
*United States v. Ray,*
  690 F. App'x 366 (6th Cir. 2017) ........................................................34
*United States v. Ray,*
  803 F.3d 244 (6th Cir. 2015) ....................................... 15, 16, 27, 30
*United States v. Rogers,*
  97 F.4th 1038 (6th Cir. 2024) ..............................................................16
*United States v. Rojas,*
  783 F.2d 105 (7th Cir. 1986) ...............................................................50
*United States v. Ronayne,*
  53 F.3d 332 (Table), 1995 WL 258137 (6th Cir. May 2, 1995) .........18
*United States v. Sangineto-Miranda,*
  859 F.2d 1501 (6th Cir. 1988) .............................................................51
*United States v. Sarli,*
  913 F.3d 491 (5th Cir. 2019) ...............................................................54
*United States v. Stevenson,*
  43 F.4th 641 (6th Cir. 2022) ................................................................46
*United States v. Thurman,*
  889 F.3d 356 (7th Cir. 2018) ...............................................................55
*United States v. U.S. Gypsum Co.,*
  333 U.S. 364 (1948) ............................................................................16
*United States v. Valdez,*
  147 F. App'x 591 (6th Cir. 2005) ........................................................49
*United States v. Villa-Castaneda,*
  755 F. App'x 511 (6th Cir. 2018) ................................................ *passim*
*United States v. Woodley,*
  713 F. App'x 449 (6th Cir. 2017) ................................................ 16, 27

*United States v. Wooldridge*,
64 F.4th 757 (6th Cir. 2023) ............................................................. 30, 31, 36, 38

*United States v. Wooten*,
602 F. App'x 267 (6th Cir. 2015) ...................................................................35

*United States v. Worley*,
193 F.3d 380 (6th Cir. 1999) ...........................................................................47

*United States v. Zabel*,
35 F.4th 493 (6th Cir. 2022) .............................................................. 15, 16, 27

*United States v. Zakhari*,
85 F.4th 367 (6th Cir. 2023) ............................................................................38

*United States v. Zapata*,
180 F.3d 1237 (11th Cir. 1999) .......................................................................48

*United States v. Zuniga*,
613 F. App'x 501 (6th Cir. 2015) ....................................................................51

Statutes

18 U.S.C. § 3231 ...............................................................................................1
21 U.S.C. § 841(a)(1) .....................................................................................4, 5
21 U.S.C. § 846 ................................................................................................4
28 U.S.C. § 1291 ............................................................................................1, 3

## STATEMENT REGARDING ORAL ARGUMENT

The United States respectfully submits that oral argument is unnecessary in this case. A thorough review of the facts, issues, and applicable law is adequately set forth in the briefs of the parties. Oral argument would not provide significant assistance to the Court in rendering an appropriate decision.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this case pursuant to 18 U.S.C. § 3231, and this Court has jurisdiction over this post-trial direct appeal from a criminal conviction pursuant to 28 U.S.C. § 1291. On September 19, 2024, the district court entered its judgment sentencing Guerrero to 168 months in prison. (Judgment, R. 488, #2363-70).[1] On September 20, 2024, Guerrero filed a timely notice of appeal. (Notice of Appeal, R. 490, #2375).

---

[1] This brief cites documents from Case No. 3:19-cr-00118 using the form "[Document Description], R. __, #[Page I.D. #]."

# STATEMENT OF THE ISSUES

I. After agents arrested Defendant-Appellant Amador Magallon Guerrero at his home pursuant to an arrest warrant, they asked him a few limited questions before providing *Miranda* warnings. Specifically, at Guerrero's house, agents asked him whether the closet they were about to access in order to retrieve his clothes had any weapons in it. And later at the federal building, agents asked Guerrero several administrative questions aimed at obtaining biographical information about Guerrero and his immediate family members. Agents then provided Guerrero with *Miranda* warnings, and he proceeded to answer their questions. Only Guerrero's statements made after the *Miranda* warnings were introduced at his trial. Did the district court err in ruling that Guerrero voluntarily waived his rights to remain silent and to counsel by answering the agents' questions after he received *Miranda* warnings, and if so, was any error harmless in the context of Guerrero's trial as a whole?

II. Did the district court commit clear error by finding that Guerrero voluntarily consented to a search of his cell phones, where he signed a written consent form in his native language of Spanish authorizing the search of both phones, and if so, was that error harmless?

# STATEMENT OF THE CASE

## A. Offense Conduct

This direct appeal from Guerrero's convictions in a narcotics case focuses solely on the denial of two of his pre-trial motions to suppress. Accordingly, a detailed description of the offense conduct is unnecessary. For present purposes, it suffices to note that, in June 2018, the Drug Enforcement Administration ("DEA"), other federal agencies, and the local police department in Nashville, Tennessee, began an investigation into the drug-trafficking activities of Guerrero and others. (Presentence Investigation Report ("PSR"), R. 517 SEALED, ¶ 15). During the investigation, law enforcement used confidential informants, controlled purchases of narcotics, court-authorized wiretaps, electronic surveillance, and other methods to investigate Guerrero's drug-trafficking activities. (*Id.*). The investigation ultimately determined that, between 2010 and 2019, Guerrero and others were responsible for trafficking large quantities of marijuana, cocaine, heroin, and other controlled substances into the Middle District of Tennessee. (*Id.* at ¶ 16).

## B. Procedural History

### i. Indictment

On April 24, 2019, a federal grand jury returned an eight-count Indictment charging Guerrero and others with a variety of narcotics-related offenses. (Indictment, R. 3, #3). Specifically, the Indictment charged Guerrero with the

3

following: conspiracy to distribute and possess with intent to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. § 846 (Count One); conspiracy to distribute and possess with intent to distribute 1 kilogram or more of heroin, in violation of 21 U.S.C. § 846 (Count Two); distribution of 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) (Count Three); possession with intent to distribute and distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1) (Count Four); attempted possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1) (Count Five); possession with intent to distribute and distribution of 100 grams or more of heroin, in violation of 21 U.S.C. § 841(a)(1) (Count Six); possession with intent to distribute and distribution of 100 grams or more of heroin, in violation of 21 U.S.C. § 841(a)(1) (Count Seven); and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and (h) (Count Eight). (*Id.* at # 3-6).

### ii. **Motions to Suppress**

Following the parties' unsuccessful attempts to resolve the case by plea agreement, (*see* Motion Requesting Change of Plea Hr'g, R. 151, #361; Joint Motion to Enlarge Pretrial Motion Deadline, R. 163, #398; Motion Cancelling Change of Plea Hr'g, R. 165, #405), on September 30, 2021, Guerrero filed four suppression motions. Two are relevant here. First, Guerrero moved to suppress statements he made to law enforcement officers during a May 2, 2019, custodial interview.

(Motion to Suppress Statements, R. 249). Second, he moved to suppress evidence derived from a consent search of his cell phones. (Motion to Suppress Cell Phone Evidence, R. 250).[2] The United States responded in opposition to both motions. (Response to Defendant's Motion to Suppress Statements, R. 320, #1488; Response to Defendant's Motion to Suppress Cell Phone Evidence, R. 322, #1496).

### iii.    Suppression Hearing

On January 26, 2023, and February 1, 2023, the district court held an evidentiary hearing on the suppression motions. (*See* Suppression Hr'g Tr. (Day One), R. 492 SEALED, #2379; Suppression H'rg Tr. (Day Two), R. 493 SEALED, #2528). The district court admitted the United States' sixteen exhibits[3] without objection and heard testimony from DEA Special Agents Matthew Passmore and Ganon Hicks, the investigating agents in this case. (Suppression H'rg Tr. (Day One), R. 492 SEALED, #2384, 2388).

---

[2] Guerrero also filed a motion seeking to suppress evidence obtained pursuant to a Facebook warrant. (Motion to Suppress Evidence Obtained Pursuant to Facebook Warrant, R. 253). The district court ultimately denied that motion as moot, and it is not at issue in this appeal. (Suppression Mem. and Order, R. 410, #2055). Guerrero's final suppression motion sought to suppress evidence obtained from wiretaps. (Motion to Suppress Evidence Obtained Pursuant to Wiretaps, R. 256, #921). The district court denied this motion in its written memorandum following the suppression hearing, and it is likewise not implicated in this appeal. (Suppression Mem. and Order, R. 410, #2057-64).

[3] Concurrently with filing this brief, and pursuant to Sixth Circuit Rule 10(b)(2), counsel is submitting copies of those exhibits (which are sealed in the district court record) to this Court.

Evidence at the suppression hearing established two narrow categories of statements that Guerrero made before he received *Miranda* warnings—the first at his residence, and the second at the federal building.

*First*, on the morning of May 2, 2019, Agents Passmore and Hicks arrested Guerrero at his residence in Madison, Tennessee. (Suppression H'rg Tr. (Day One), R. 492 SEALED, #2392). After Guerrero answered the door in his underwear, agents informed him they had a warrant for his arrest and handcuffed him. (*Id.* at #2393). Guerrero asked if he could get dressed, so the agents brought him to his bedroom to collect some clothes. (*Id.*). Guerrero told the agents his clothes were in the closet. (*Id.*). For their own safety, the agents asked Guerrero if he had any weapons or anything that would harm them in the closet; Guerrero replied that he had two pistols in his closet. (*Id.* at #2393, 2446-47). The agents then got Guerrero's clothes out of the closet, as opposed to allowing Guerrero to retrieve the clothes himself. (*Id.* at #2446-47). This colloquy all took place in English. (*Id.* at #2394). The agents did not give Guerrero *Miranda* warnings at the house because they did not plan to question him at his home. (*Id.* at #2395-96).[4]

---

[4] The United States did not charge Guerrero with any offenses related to the pistols or the user quantity of cocaine discovered at the house. (Suppression H'rg Tr. (Day One), R. 492 SEALED, #2397, 2448). And, as the district court noted, the United States did not use any pre-*Miranda* statements in its case-in-chief either. (Suppression Mem. and Order, R. 410, #2067).

*Second*, after approximately 45 minutes to an hour at the house, the agents transported Guerrero to the federal building in Nashville, which contained the Nashville DEA office. (*Id.* at #2398). The entire interview with Guerrero in the federal building lasted approximately 90 minutes, and it was recorded by audio and video and is in the record. (*Id.* at #2381, 2399, 2449; Tr. of May 2, 2019 Guerrero Statement, R. 252-2 SEALED). At the outset of the interview, agents asked Guerrero a few administrative questions before providing him with *Miranda* warnings. As the district court summarized:

> They asked him for his name, whether he had a social security number, and whether he had any prior arrests. (Trans. at 2-3). Agent Hicks also questioned Guerrero about his family members, including their names, ages, and place of residence. (*Id.* at 3-7). These initial questions lasted a few minutes.

(Suppression Mem. and Order, R. 410, #2065 (footnote omitted)).

Agent Hicks then provided Guerrero with *Miranda* warnings. The district court's opinion reproduces the *Miranda* warnings in full:

**Agent Hicks**: . . . So, this is kind of like on T.V. –

**Guerrero**: Uh-huh (affirmative).

**Agent Hicks**: – when they read your rights, right?

**Guerrero**: Yeah, yeah.

**Agent Hicks**: So, you have the right to remain silent. Anything you say can and will be used against you in a court of law.

**Guerrero**: Uh-huh (affirmative).

**Agent Hicks**: You have the right to have an attorney present with you during questioning. And if you can't afford an attorney, the Government will provide one for you.

**Guerrero**: Okay.

**Agent Hicks**: Okay. Do you understand those?

**Guerrero**: Yes.

(*Id.* at #2065-66 (quoting Tr. of May 2, 2019 Guerrero Statement, R. 252-2 SEALED, at 7-9)).

After being advised of his rights, Guerrero proceeded to answer to answer the agents' questions regarding the details of his drug operation. (*Id.* at #2066 (citing Tr. of May 2, 2019 Guerrero Statement, R. 252-2 SEALED, at 9-145)).

During the interview, Guerrero also consented—both orally and in writing—to the search of both of his cell phones. (Suppression H'rg Tr. (Day One), R. 492 SEALED, #2402, 2463-65). The district court reproduced the relevant portion of the consent colloquy in full in its memorandum opinion. (Suppression Mem. and Order, R. 410, #2075-78 (quoting Tr. of May 2, 2019 Guerrero Statement, R. 252-2 SEALED, at 20-32)).

Before Guerrero signed the written consent form, the agents asked whether he would prefer an English or Spanish-language consent form:

**Agent Passmore**: So, let me explain this. English or Spanish, which do you read better?

**Mr. Guerrero**: Spanish I read better. It's my first language.

**Agent Passmore**: Okay.

**Mr. Guerrero**: But I can understand English.

(Tr. of May 2, 2019 Guerrero Statement, R. 252-2 SEALED, at 30; Suppression H'rg

Tr. (Day One), R. 492 SEALED, #2403).

Based on Guerrero's preference, the agents provided him with a Spanish-
language consent form for the search of his devices, which he signed. (Tr. of May 2,
2019 Guerrero Statement, R. 252-2 SEALED, at 30-32; Suppression H'rg Tr. (Day
One), R. 492 SEALED, #2403, 2465). The signed consent form—which was a single
page and consisted of three short paragraphs—is contained in the record. (Signed
Consent Form, R. 322-1, #1501). The agents' interview of Guerrero was cordial,
respectful, and never became heated. (Suppression H'rg Tr. (Day One), R. 492
SEALED, #2468).

Agents Passmore and Hicks also provided testimony establishing Guerrero's
familiarity with English. They testified that a confidential informant who does not
speak Spanish set up a controlled drug buy with Guerrero. (Suppression H'rg Tr.
(Day One), R. 492 SEALED, #2389, 2439). That drug buy was recorded by both
audio and video, and Guerrero and the confidential informant conducted the buy

exclusively in English.[5] (*Id.* at #2389-90, 2459-61). Both agents also testified that numerous intercepted calls and text messages between Guerrero and others concerning drugs were conducted exclusively in English. (*Id.* at #2391, 2443-44).

On the second day of the suppression hearings, an expert testified for the defense. (Suppression H'rg Tr. (Day Two), R. 493 SEALED, # 2529). The expert had never met Guerrero in person, was surprised by the undisclosed fact that Guerrero had completed twelfth grade in Mexico, had never heard any of the phone calls between Guerrero and the non-Spanish-speaking cooperating individual, and was not given access to the dozens of hours of wiretaps where Guerrero was recorded speaking English. (*Id.* at #2572, 2575, 2579, 2582).

### iv.    The District Court Denies the Motions to Suppress

After the hearing, the district court directed the parties to submit post-hearing briefs addressing several issues identified by the district court. (Order on Post-Hearing Briefs, R. 353, #1731). The parties submitted those briefs under seal. (*See* United States' Post-Hearing Brief, R. 362 SEALED; Defendant's Post-Hearing Brief, R. 366 SEALED; United States' Post-Hearing Reply, R. 369 SEALED).

On September 11, 2023, the district court entered a twenty-seven-page memorandum opinion denying the motions to suppress. (Suppression Mem. and

---

[5] The jury also heard this fact multiple times at trial. (Trial Tr. (Vol 1A), R. 497, #2642-48; Trial Tr. (Vol 2), R. 499, #2873; Government's Tr. Exhibits 1-6, 86).

Order, R. 410, #2055). The district court found that, although the *Miranda* warnings given during the interview were a deviation from the standard warnings (in that Guerrero "was advised that he had the right [to] an attorney *during questioning*, but not specifically that he had a right to an attorney *before questioning*"), the warnings were nevertheless effective. (*Id.* at #2069-70). The district court also concluded the waiver of Guerrero's Fifth Amendment rights was voluntary, knowing, and intelligent because the interrogation was relatively short, Guerrero had been in the United States for more than ten years, told officers he understood English, and communicated effectively during the interview in English. (*Id.* at #2070). The district court pointed to Guerrero's own statement that he understood English, the fact that intercepted calls and messages with Guerrero were conducted exclusively in English, and the fact that Guerrero conversed freely during the interview with the agents. (*Id.* at #2071-72).

The district court also rejected Guerrero's arguments under *Missouri v. Seibert*, 542 U.S. 600 (2004). (*Id.* at #2073-74). As an initial matter, the district court noted that "the circumstances of Guerrero's interrogation and waiver are far afield from those in *Seibert* where the defendant was subjected to 'systematic, exhaustive' questioning, *Mirandized* only after confessing, and then pressured to confess again." (*Id.* at #2073). Here, by contrast, there was "very little overlapping content between the pre-*Miranda* and post-*Miranda* statements." (*Id.*). The district court ultimately

concluded that the pre- and post-*Miranda* questions were sufficiently distinct that the *Miranda* warning at the federal building presented Guerrero with a genuine choice of whether to answer more questions. (*Id.* at #2073-74). Accordingly, the motion to suppress the statements was denied. (*Id.* at #2074)

As to Guerrero's consent to search the cellphones, the district court found that the agents conducted themselves in a "serious but cordial manner." (*Id.* at #2079). The district court found that the agents had solicited consent from Guerrero more than once, but that repeating the question without more coercive tactics was not objectively coercive. (*Id.*). The district court also pointed to Guerrero's provision of the passcode for his smartphone and noted that a threat to perform a lawful search is not inherently coercive. (*Id.* at #2079-80). Accordingly, the district court denied the motion to suppress the cellphone evidence as well. (*Id.* at #2080).

### v. Trial

The case proceeded to a jury trial beginning on February 6, 2024. (Criminal Minutes, R. 452, #2242). At trial, the jury heard and saw a variety of evidence establishing Guerrero's guilt, some of which is summarized in **Section I.F** below in connection with the issue of harmless error. On February 9, 2024, the jury convicted Guerrero on all eight counts. (Verdict Form, R. 458, #2253; Criminal Minutes, R. 457, #2252).

### vi. Sentencing

On September 19, 2024, after considering several sentencing-related disputes, the district court sentenced Guerrero to a below-guidelines term of 168 months in prison. (Criminal Minutes, R. 486, #2361; Sentencing H'rg Tr., R. 502 SEALED; Judgment, R. 488, #2365).

This appeal followed.

# SUMMARY OF THE ARGUMENT

Guerrero raises two arguments on appeal, but they both fail.

*First*, Guerrero argues he did not validly waive his Fifth Amendment right to remain silent or his Sixth Amendment right to counsel before answering agents' questions, and so the introduction of his post-*Miranda*-warning statements at trial violated his rights under those Amendments. This argument fails because (i) the agents' initial unwarned questions did not implicate *Miranda* because they either fell under the public safety exception or were administrative questions that did not amount to "interrogation"; (ii) the agents' *Miranda* warnings reasonably conveyed the essential messages required by *Miranda*; (iii) Guerrero knowingly, intelligently, and voluntarily waived his *Miranda* rights by answering the agents' questions after receiving *Miranda* warnings; (iv) the earlier unwarned questioning did not infect the later warned questioning; and (v) even if it was error to admit Guerrero's warned statements at trial, any error was harmless in light of the overwhelming other evidence of Guerrero's guilt presented to the jury at trial.

*Second*, Guerrero challenges the district court's finding that he voluntarily consented to the search of his cell phones. But the district court did not clearly err in finding that Guerrero voluntarily consented to this search, particularly in light of the Spanish consent form that he signed. And even if the district court erred in admitting the cell phone evidence, it was harmless in light of the trial evidence as a whole.

**ARGUMENT**

I.   **AGENTS DID NOT VIOLATE GUERRERO'S FIFTH OR SIXTH AMENDMENT RIGHTS BECAUSE HE WAIVED THEM FOLLOWING VALID *MIRANDA* WARNINGS.**

At no point did agents violate Guerrero's constitutional rights during or after his arrest on May 2, 2019. Their limited unwarned interactions with Guerrero did not implicate *Miranda*, and Guerrero's subsequent custodial interview occurred only after effective *Miranda* warnings and a valid, voluntary waiver. Further, this case simply does not present coercive "*Miranda*-in-the-middle" practices that could have undermined the *Miranda* warnings Guerrero received. Therefore, even if agents' initial unwarned questions implicated *Miranda*, Guerrero's admissions during the later post-*Miranda* interview were admissible evidence (as excerpted) at trial. And even if any *Miranda* error had occurred, it would have been harmless in the context of Guerrero's trial as a whole.

A.   **Standard of Review**

Where, as here, a district court denies a motion to suppress that is based on a claimed *Miranda* violation or a claimed violation of the defendant's Sixth Amendment right to counsel, this Court views the district court's factual findings in the light most favorable to the government and reviews them for clear error. *United States v. Zabel*, 35 F.4th 493, 501 (6th Cir. 2022) (Fifth Amendment *Miranda* claim); *United States v. Ray*, 803 F.3d 244, 265 (6th Cir. 2015) (same); *United States v.*

*Woodley*, 713 F. App'x 449, 453 (6th Cir. 2017) (Sixth Amendment denial-of-right-to-counsel claim).[6]

Clear-error review is "highly deferential" and requires this Court to "leave fact finding to the district court unless [this Court is] 'left with the definite and firm conviction that a mistake has been committed.'" *Taglieri v. Monasky*, 907 F.3d 404, 408 (6th Cir. 2018) (en banc) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). As this Court has at times more colorfully described it, a district court's factual finding is not clearly erroneous unless it "strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." *Id.* (quoting *United States v. Perry*, 908 F.2d 56, 58 (6th Cir. 1990)).

As for the district court's legal conclusions, this Court reviews them *de novo*. *Zabel*, 35 F.4th at 501; *Ray*, 803 F.3d at 265; *Woodley*, 713 F. App'x at 453. "A 'denial of a motion to suppress will be affirmed on appeal if the district court's conclusion can be justified for any reason.'" *United States v. Rogers*, 97 F.4th 1038, 1041 (6th Cir. 2024) (quoting *United States v. Moorehead*, 912 F.3d 963, 966 (6th Cir. 2019)).

---

[6] Guerrero is thus incorrect when he broadly asserts that the standard of review for his Sixth Amendment claim is *de novo*. (*See* Appellant Br. 14 (citing *United States v. Hardy*, 586 F.3d 1040, 1043 (6th Cir. 2009) (noting *de novo* standard in context of Sixth Amendment compulsory process context at trial)).

**B.** **Agents' Unwarned Interactions with Guerrero Did Not Implicate**
    ***Miranda*.**

Guerrero argues that agents violated his *Miranda* rights when they asked him

unwarned questions (1) following the arrest at his residence, and (2) during the brief

pre-*Miranda* exchange at the DEA office. (Appellant Br. 18-21).

As an initial matter, the government did not introduce at trial Guerrero's

unwarned statements falling into either of these two categories. Accordingly, the

mere fact that the agents asked these questions without providing *Miranda* warnings

did not constitute a *Miranda* violation. *United States v. Patane*, 542 U.S. 630, 641

(2004) (plurality opinion) (stating that *Miranda* "violations occur, if at all, only upon

the admission of unwarned statements into evidence at trial"). Guerrero does not

argue otherwise. Instead, it appears that Guerrero merely seeks to use these

statements as a predicate for his claim under *Missouri v. Seibert*, which is discussed

in **Section I.E** below. Nonetheless, to the extent it may be relevant to the *Seibert*

analysis that follows, the government will explain why the statements at issue would

not have violated *Miranda* even had they been introduced into evidence at trial.

The sole question posed to Guerrero at his home—*i.e.*, whether there were

"any weapons or anything that would harm [officers]" in the closet that contained

Guerrero's clothes (Suppression Hr'g Tr. (Day One), R. 492 SEALED, #2393)—

was a matter of officer safety and thus did not implicate *Miranda*. *New York v.*

*Quarles*, 467 U.S. 649, 655-58 (1984). Under *Quarles'* public safety exception,

"officers may ask 'questions necessary to secure their own safety or the safety of the public' without violating *Miranda*." *United States v. Lester*, 98 F.4th 768, 774 (6th Cir. 2024) (quoting *Quarles*, 467 U.S. at 659). The agents' question here was plainly necessary to ensure officer safety. *See id.* at 772, 774-75 (*Quarles* exception applied to officer's question regarding whether the defendant had "items that could 'stick or harm' him during" a patdown search).

Guerrero argues *Quarles* cannot apply because he was handcuffed. (Appellant Br. 19). But this Court has applied *Quarles* even when a suspect was restrained at the time of the question if there was a still a safety risk. *United States v. Ronayne*, 53 F.3d 332 (Table), 1995 WL 258137, *2, 4 (6th Cir. May 2, 1995); *United States v. Blackmon*, 142 F.3d 437 (Table), 1998 WL 109992, at *1, 3 (6th Cir. Mar. 3, 1998) (per curiam). Here, the testimony makes clear that, based on Guerrero's response, the agents decided to retrieve Guerrero's clothes from the closet, rather than allowing him to access the closet himself. (Suppression Hr'g Tr. (Day One), R. 492 SEALED, #2446-47). Thus, there was a real possibility that, absent this question, Guerrero could have accessed a weapon in the closet, and this question served to ensure the agents' safety.

The agents' pre-*Miranda* background questions to Guerrero at the DEA office also did not implicate *Miranda*. They asked him only about the spelling of his name, his address, whether he had a social security number, whether he had any prior

arrests, and basic information regarding immediate family members (none of whom faced criminal charges in this case). (*See* Suppression Mem. and Order, R. 410, #2065 (citing Tr. of May 2, 2019 Guerrero Statement, R. 252-2 SEALED, at 2-7)). In *Pennsylvania v. Muniz*, 496 U.S. 582, 601-02 (1990), the Supreme Court held that questions "reasonably related to the police's administrative concerns" do not trigger *Miranda* because they do not constitute "interrogation." *See United States v. Clements*, 333 F. App'x 981, 990 (6th Cir. 2009) (providing the defendant's name, address, height, weight, eye color, date of birth and current address as examples of information that falls under this exception). Here, the questions at the DEA office before the *Miranda* warnings were administrative questions that did not implicate *Miranda*.

Thus, Guerrero's unwarned statements in this case would not have violated his *Miranda* rights even if they were introduced at trial—which, out of an abundance of caution, they were not.

## C. Agents Properly Administered *Miranda* Warnings.

Before attempting a custodial interview at the DEA office, agents administered *Miranda* warnings to advise Guerrero of his constitutional rights. As detailed below, the warnings included all the essential components.

The first requirement of a *Miranda* warning is that a suspect be "informed in clear and unequivocal terms that he has the right to remain silent." *Miranda v.*

*Arizona*, 384 U.S. 436, 467-68 (1966). Next, agents must explain "that anything said can and will be used against the individual in court." *Id.* at 469. In this case, Agent Hicks informed Guerrero of both these rights:

> **Agent Hicks**: So, you have the right to remain silent. Anything you say can and will be used against you in a court of law.
>
> **Mr. Guerrero**: Uh-huh (Affirmative).

(Tr. of May 2, 2019 Guerrero Statement, R. 252-2 SEALED, at 7).

Next, an individual "must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation." *Miranda*, 384 U.S. at 471. Finally, agents must inform the individual that, "if he is indigent, a lawyer will be appointed to represent him. *Id.* at 473. Here, agents also informed Guerrero of these rights:

> **Agent Hicks**: You have the right to have an attorney present with you during questioning. And if you can't afford an attorney, the Government will provide one for you.
>
> **Mr. Guerrero**: Okay.

(Tr. of May 2, 2019 Guerrero Statement, R. 252-2 SEALED, at 7).

The agents concluded their *Miranda* warning by confirming that Guerrero understood these rights. (*Id.* at 7-8).

Guerrero presents three arguments as to why his *Miranda* warnings were insufficient: (1) the warnings were not read verbatim from a card (Appellant Br. 29-

30); (2) he was not separately warned about his ability to meet with counsel *before* questioning began (as opposed to *during* questioning) (*id.* at 28); and (3) Agent Hicks said "the government" would provide an appointed lawyer if he could not afford one (*id.*). Each of these arguments fails.

*First*, the agents were not required to read the *Miranda* warnings verbatim from a card because it is well-established that *Miranda* warnings "need not be formulaic." *United States v. Clayton*, 937 F.3d 630, 638 (6th Cir. 2019). Instead, the warning need only "touch[] all of the bases required by *Miranda*" in order to "reasonably convey to a suspect his rights." *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989). Here, Agent Hicks' warning satisfied the *Miranda* requirements and conveyed each of Guerrero's rights to him.

*Second*, the *Miranda* warnings were effective even though Agent Hicks did not specifically state that Guerrero's meeting with counsel could occur *before* (as opposed to *during*) questioning. The district court's reasoning on this point is persuasive and correct. (*See* Suppression Mem. and Order, R. 410, #2069-70). As the district court observed, this Court in *Clayton* considered "the mirror image" of the warning in this case—that is, a warning that advised the defendant he had the right to consult with an attorney before (but not during) questioning. 937 F.3d at 637. In analyzing that "mirror image" warning, this Court emphasized that *Miranda* "merely required that a defendant be informed of his right to 'the presence of an

attorney.'" *Id.* at 639 (quoting *Miranda*, 384 U.S. at 479). And while that "presence" "includes the right to consult with an attorney before and during questioning," *Miranda* "did not require a warning exactly to that effect." *Id.* Instead, a warning is sufficient if it "reasonably conveys the rights at issue." *Id.* at 637. And there, the warning was sufficient because it "reasonably conveyed" the "same essential message." *Id.* at 639 (quoting *Florida v. Powell*, 559 U.S. 50, 62, 64 (2010)).

Here, too, Agent Hicks' warnings reasonably conveyed the essential message that Guerrero had the right to the presence of an attorney. This Court's job "is simply to ask whether a 'commonsense reading' of the actual language employed meets the aims of *Miranda*." *Id.* at 641 (quoting *Powell*, 559 U.S. at 64). And it would have been commonsense for Guerrero to conclude that, if he had "the right to have an attorney present with you during questioning" as Agent Hicks said, then he could speak with that attorney even before Agent Hicks asked the first question. In short, this was no alternative *Miranda* warning that failed to convey the information—this was a simple, conversational version that "'touch[ed] all of the bases' reasonably to convey to a suspect his rights under *Miranda*." *Id.* at 638 (quoting *Duckworth*, 492 U.S. at 203).

*Third*, Agent Hicks' statement that "the government" would provide an attorney to Guerrero if he could not afford one likewise conveyed the "same essential message" required by *Miranda*, *see id.* at 639—this time, that a lawyer could be

appointed to represent him if he was indigent. Guerrero does not cite any case to support his suggestion that telling a suspect "the government" would appoint an attorney is even technically incorrect, *cf. United States v. Botello-Rosales*, 728 F.3d 865, 867 (9th Cir. 2013) (describing "*the government's* obligation to appoint an attorney for an indigent suspect who wishes to consult one" (emphasis added)), let alone so incorrect that it would fail to reasonably convey the essential message of the *Miranda* warnings.

### D. Guerrero Voluntarily, Knowingly, and Intelligently Waived his Fifth and Sixth Amendment Rights.

After receiving *Miranda* warnings, Guerrero voluntarily, knowingly, and intelligently waived both his Fifth and Sixth Amendment rights.

A defendant may waive his rights following *Miranda* warnings "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444. There are "two distinct dimensions" to this inquiry. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* "Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* "Only if the 'totality of the circumstances surrounding the interrogation' reveal[s] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have

been waived." *Id.* (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). "Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." *Id.* at 422-23.

Courts should conduct this inquiry "'primarily from the perspective of the police,' such that where '[the] police had no reason to believe that [the defendant] misunderstood the warnings, . . . there is no basis for invalidating [the] *Miranda* waiver.'" *United States v. Al-Cholan*, 610 F.3d 945, 954 (6th Cir. 2010) (quoting *Garner v. Mitchell,* 557 F.3d 257, 263 (6th Cir. 2009)).

It is also well established that the Sixth Amendment right to counsel may be waived by a defendant, if the waiver is voluntary, knowing, and intelligent. *Patterson v. Illinois,* 487 U.S. 285, 292 n.4 (1988); *Brewer v. Williams,* 430 U.S. 387, 404 (1977); *Johnson v. Zerbst,* 304 U.S. 458, 464 (1938). Generally, when a defendant is appropriately read his *Miranda* rights and chooses to waive them, that waiver also waives his Sixth Amendment right to counsel. *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009). In the instant case, Guerrero's waiver also covered his Sixth Amendment right to counsel.

### i. The Waiver was Implicit

As an initial matter, Guerrero argues that the agents failed to ask follow-up questions to determine whether he was willing to waive his right to counsel. (Appellant Br. 26.) But no such follow-up questions were required. As the district court correctly found, (Suppression Mem. and Order, R. 410, #2068), after agents advised Guerrero of his *Miranda* rights, he implicitly waived those rights by not invoking them and instead participating in an interview. *Berghuis v. Thompkins*, 560 U.S. 370, 388-89 (2010) ("A suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police.").

### ii. The Waiver was Voluntary

The record establishes that Guerrero's *Miranda* waiver was voluntary and not the product of a coordinated campaign of intimidation, coercion, or deception. At the suppression hearing, Agent Hicks testified that his interactions with Guerrero were cordial, respectful on both sides, and never got heated. (Suppression H'rg Tr. (Day One), R. 492 SEALED, # 2468). Agent Hicks did not recall any point during the interview at the DEA office in which Guerrero appeared to be uncomfortable or under duress. (*Id.*) Similarly, Agent Passmore confirmed the same characterizations of the interaction during his testimony at the hearing. (*Id.* at #2405-06). The district court—after listening to both agents' testimony and watching the recorded

interview—repeatedly pointed to the agents' testimony in denying the motion. (Suppression Mem. and Order, R. 410, # 2055). The district court was entitled to credit the agents' statements, as it apparently did, and Guerrero points to nothing that could demonstrate that credibility finding was clearly erroneous.

### iii. The Waiver was Knowing and Intelligent

Guerrero's *Miranda* waiver was also knowing and intelligent. A *Miranda* waiver is knowing and intelligent when it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Ramamoorthy*, 949 F.3d 955, 965 (6th Cir. 2020). Here, Guerrero told agents that he understood his rights after Agent Hicks administered the *Miranda* warning. (Tr. of May 2, 2019 Guerrero Statement, R. 252-2 SEALED, at 7-8). Agents Passmore and Hicks both testified that, while they occasionally needed to clarify what Guerrero said during his interview, they had no reason to believe that he struggled to understand any part of it. (Suppression H'rg Tr. (Day One), R. 492 SEALED, #2404-05, 2467).

Guerrero cites *United States v. Villa-Castaneda*, 755 F. App'x 511 (6th Cir. 2018), but that case supports an affirmance here. (*See* Appellant Br. 33). In *Villa-Castaneda*, this Court "review[ed] the evidence in the light most likely to support the district court's decision," and upheld the district court's finding of fact that the defendant there could sufficiently speak and understand English. 755 F. App'x at

517 (quoting *Al-Cholan*, 610 F.3d at 954). *Villa-Castaneda* also explained that "it is 'primarily from the perspective of the police' that a court must weigh the evidence of a defendant's knowledge of English[.]" *Id.* (quoting *Al-Cholan*, 610 F.3d at 954).

Similarly here, both Agent Passmore and Agent Hicks testified about the many instances they observed where Guerrero conversed freely with others in English in the months prior to his arrest. More specifically, the agents testified about a controlled drug buy and several phone calls between Guerrero and a confidential source that were conducted in English. (Suppression H'rg Tr. (Day One), R. 492 SEALED, #2389-90; 2438-2439). Both agents also testified to multiple intercepted calls and text messages between Guerrero and others that were exclusively in English. (*Id.* at #2391, 2443-44). Therefore, by the time of Guerrero's arrest, agents knew that he spoke and understood English. The district court thus found that the agents "had no reason to believe a language barrier prevented Guerrero from understanding his rights," particularly given that Guerrero informed the agents during the interview that "he understands English." (Suppression Mem. and Order, R. 410, #2072). Reviewing this finding for clear error and in the light most favorable to the government, *see Zabel*, 35 F.4th at 501; *Ray*, 803 F.3d at 265; *Woodley*, 713 F. App'x at 453, this Court should not be left with the definite and firm conviction that a mistake was made, *see Taglieri*, 907 F.3d at 408.

Guerrero urges this Court to ignore that part of *Villa-Castaneda* and instead employ a set of factors developed by the Ninth Circuit and discussed in *Villa-Castaneda* to find that his *Miranda* waiver was not knowing or voluntary. (Appellant Br. 33-34). In *Villa-Castaneda*, however, this Court acknowledged that the Ninth Circuit's *Garibay* factors merely served as a "guide" to further support its conclusion (discussed above) that the defendant understood his *Miranda* warnings and validly waived his rights. 755 F. App'x at 518. This Court has not adopted the *Garibay* factors in a published opinion and does not appear to have used them since 2018.

The *Garibay* factors do not apply here because, as just discussed above, the district court found that the agents had no reason to believe Guerrero struggled to understand English, and that finding was not clearly erroneous. In any event, even if this Court looked to the *Garibay* factors, they would not support a reversal here. The *Garibay* factors are:

> (1) whether the defendant signed a written waiver; (2) whether the defendant was advised of his rights in his native tongue; (3) whether the defendant appeared to understand his rights; (4) whether a defendant had the assistance of a translator; (5) whether the defendant's rights were individually and repeatedly explained to him; and (6) whether the defendant had prior experience with the criminal justice system.

*Villa-Castaneda*, 755 F. App'x at 518 (quoting *United States v. Garibay*, 143 F.3d 534, 539 (9th Cir. 1998)). "*Garibay* concluded that suppression was proper where 'none of these considerations were present.'" *Id.* (brackets omitted) (citing *Garribay*,

143 F.3d at 539). But here, the record reflects that "Guerrero conversed freely with the agents, giving no indication that [] he was unable to understand the questions asked or the *Miranda* warnings when given," (Suppression Mem. and Order, R. 410, #2072), meaning at least one of these considerations *was* present, and so this is case is distinguishable from *Garibay* even if this Court chooses to apply it.

*** *** ***

For these reasons, Guerrero voluntarily, knowingly, and intelligently waived his rights to counsel and against self-incrimination after effective *Miranda* warnings.

### E.     The Limited Unwarned Questioning Did Not Infect the Warned Questioning.

In *Missouri v. Seibert*, 542 U.S. 600 (2004), the Supreme Court considered how *Miranda* applies to "a police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession," and then "follow[ing] [the confession] with *Miranda* warnings and . . . lead[ing] the suspect to cover the same ground a second time." *Id.* at 604 (plurality opinion). A plurality of the Court identified "a series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object":

> the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second [interrogations], the continuity of police personnel, and the degree to which the

interrogator's questions treated the second round as continuous with the first.

*Id.* at 615.

In *United States v. Ray* (*Ray I*), 803 F.3d 244, 272 (6th Cir. 2015), this Court "adopt[ed] the multi-factor test announced by the *Seibert* plurality."[7]

### i. The Court Need Not Mechanically Count the *Seibert* Plurality's Factors to Resolve this Case.

Guerrero argues this case is like *Seibert* because agents asked him one question at his house and a handful of administrative questions before receiving *Miranda* warnings at the DEA office. By employing a "technique of interrogating in successive unwarned and warned phases," Guerrero asserts, agents deliberately compounded multiple constitutional violations to coerce him into making involuntary statements. (Appellant Br. 22-25). But that is simply not what happened in this case. Rather, agents asked him a few discrete questions at the house and then at the DEA office, then provided *Miranda* warnings, and then did not exploit the

---

[7] As this Court has recently observed, the Sixth Circuit is "alone" in adopting the *Seibert* plurality opinion's "objective approach to midstream *Miranda* warnings, which does not consider the intent of the officer's conduct." *United States v. Wooldridge*, 64 F.4th 757, 762 (6th Cir. 2023). This panel is, of course, bound by *Ray I*. But at the appropriate time the Court may wish to reconsider "whether [it] must keep [its] side of this circuit split open." *See id.* The instant case aptly demonstrates the analytical difficulties that may arise from trying to force the square peg of facts that are different from the intentional police "technique of interrogating in successive, unwarned and warned phases," *see Seibert*, 542 U.S. at 609 (plurality opinion), into the round hole of the *Seibert* plurality's factors.

prior unwarned answers to extract warned statements. Significantly, there was no meaningful overlap between Guerrero's unwarned statements and the later warned statements that were admitted at trial. This case thus does not present a *Seibert* fact pattern.

To be sure, this panel is bound by *Ray I*'s adoption of the *Seibert* plurality's test. But this Court recently clarified that "[t]he *Seibert* plurality did not 'condemn us to a mechanical counting of items on a list.'" *United States v. Wooldridge*, 64 F.4th 757, 761 (6th Cir. 2023) (brackets omitted) (quoting *United States v. Heron*, 564 F.3d 879, 887 (7th Cir. 2009)). Instead, the *Seibert* plurality's "analysis 'hinges on' an encompassing question: Did the *Miranda* warning give the suspect 'a genuine choice whether to follow up on his earlier admission'?" *Id.* at 761-62 (brackets omitted) (quoting *Seibert*, 542 U.S. at 616). On this record—where the unwarned questioning was brief, there was next to zero overlap between the warned and unwarned questioning, and agents made no effort to exploit prior unwarned statements to obtain warned statements—the answer to that question is yes, regardless of whether this Court "mechanical[ly] count[s]" the *Seibert* plurality's factors. *See id.* at 761.

> **ii.    Even Taking the *Seibert* Factors into Account, Guerrero's *Miranda* Warnings were Effective.**

Even if this Court applies the *Seibert* plurality's factors, they point toward an affirmance here.

### a. *Completeness and Detail of Initial Questioning*

The first factor is "the completeness and detail of the questions and answers in the first round of interrogation." *Seibert*, 542 U.S. at 615 (plurality opinion). The unwarned questioning in this case—which consisted solely of the single question at the house regarding weapons in the closet, and the handful of administrative questions at the DEA office—was not complete or detailed. Underscoring the point, the administrative questions took up five pages of the interview transcript, whereas the warned questioning spanned nearly 140 pages. (*Compare* Tr. of May 2, 2019 Guerrero Statement, R. 252-2 SEALED, at 2-7 (unwarned administrative questions), *with id.* at 7-145 (warned questioning)).

Guerrero contends this factor weighs against the government because the "initial interrogation . . . led to obtaining incriminating evidence." (Appellant Br. 25). That argument is a non sequitur; whether questioning was complete and detailed is a different question from whether it "led to obtaining incriminating evidence." It is also not clear what "incriminating evidence" Guerrero believes the initial questioning led to—in other words, what was the causal connection between the initial unwarned questioning and later "incriminating evidence?" Guerrero never says.

In support of this assertion, he cites only *United States v. Pacheco-Lopez*, 531 F.3d 420, 422, 428 (6th Cir. 2008). But that case is distinguishable. In *Pacheco-*

*Lopez*, agents in Kentucky encountered the defendant while executing a search warrant in the wake of a multi-kilogram drug bust. *Id.* at 422. In response to pre-*Miranda* questioning, the defendant told officers he lived in Mexico (not in Kentucky), and that he had driven from Mexico to the Kentucky residence in a pickup truck the previous Sunday. *Id.* After the defendant made these unwarned admissions, officers Mirandized the defendant and he then admitted that he had transported cocaine. *Id.* at 422-23.

Under these circumstances, *Pacheco-Lopez* concluded that the first *Seibert* factor weighed against the government because "the post-*Miranda* question resulted from the knowledge gleaned during the initial questioning—that [the defendant] had driven from Mexico to Kentucky (*i.e.* from a country serving as a cocaine conduit to a state where no cocaine is produced), via pickup truck, during the preceding week." *Id.* at 428. That is, the officers' post-*Miranda* question regarding the defendant's transportation of cocaine "was not anomalous . . . but was the next logical question based on the earlier statements." *Id.* Here, by contrast, Guerrero offers no explanation of how the agents' post-*Miranda* questions "resulted from the knowledge" agents gained when they asked him whether he had weapons in his closet and for limited biographical information regarding Guerrero and his immediate family members.

Indeed, here (unlike in *Pacheco-Lopez*) the government already had an indictment in hand and evidence in the form of controlled purchases of narcotics and recorded wire conversations when agents knocked on Guerrero's door. Agents did not ask Guerrero any pre-*Miranda* questions "needed to make an arrest, tailor their post-*Miranda* interrogation, [or] secure a conviction." *Cf. United States v. Ray*, 690 F. App'x 366, 373 (6th Cir. 2017) (finding that unwarned questions about recovered firearms were detailed and complete enough to suggest ineffectiveness of *Miranda* warning, where defendant subsequently faced firearm possession charges). Agents did not ask Guerrero any pre-*Miranda* questions regarding drugs, drug trafficking, or money laundering, and nothing regarding the firearms in his closet was introduced at trial. Under these circumstances, the post-*Miranda* questioning did not result from knowledge agents gained from the limited pre-*Miranda* questions, and so *Pacheco-Lopez* is not on-point.

### b. *Overlapping Content of the Statements*

The second *Seibert* factor—the degree of overlapping content between the statements—strongly favors the government here. There was next to no overlap in this case between the limited pre-warning questions and the subsequent warned questions. Guerrero argues that "the initial questioning dealt with contraband and background information that was tied to the drug trafficking investigation." (Appellant Br. 25). But the record belies this assertion. The agents asked the single

question at Guerrero's house about whether there were weapons in the closet that Guerrero said contained his clothes. The pre-*Miranda* questions at the DEA office involved basic information about Guerrero and his immediate family members. The post-*Miranda* interview, by contrast, focused on Guerrero's involvement in the drug trafficking and money laundering conspiracies detailed in the Indictment, though agents did ask where Guerrero had purchased the firearms. (Tr. of May 2, 2019 Guerrero Statement, R. 252-2 SEALED, at 7-145). Therefore, the initial questioning just barely overlapped with the post-*Miranda* interview, and not in a way that was relevant to the charges or evidence at trial.

### c. *Timing and Setting of the First and Second Rounds*

The third *Seibert* factor addresses the timing and setting of the first and second interrogations. This factor favors the government when a defendant's warned and unwarned statements are "separated both in time and in setting." *United States v. Wooten*, 602 F. App'x 267, 274 (6th Cir. 2015). Guerrero argues that, because agents asked pre-*Miranda* questions at the DEA office, there "was no real break between unwarned and warned statements" and the questioning "appeared continuous" despite the location change from Guerrero's home. (Appellant Br. 25-26).

Here, the setting indisputably changed after agents asked Guerrero about firearms in his closet during his arrest. Agents transported Guerrero to the DEA office, where he was Mirandized and interviewed. And approximately 45 minutes to

an hour elapsed between the exchange during Guerrero's arrest and his interaction with agents at the DEA office. *See Woolridge*, 64 F.4th at 762 (fifteen-minute gap between unwarned and warned questioning favors the government). There was a definite break in both time and setting between the initial question and Guerrero's subsequent interview.

To be sure, the background questions about Guerrero and his family at the DEA office occurred at the same location as his warned interview and just before *Miranda* warnings were given. But that is not significant to the overall coercion analysis given the routine and non-overlapping nature of these unwarned administrative questions.

### d. Continuity of Police Personnel

The fourth *Seibert* factor examines whether the same law enforcement officers conducted the warned and unwarned interrogations. The agents that arrested Guerrero also Mirandized him and conducted his interview at the DEA office. Therefore, there was continuity of police personnel, which weighs in Guerrero's favor.

### e. Degree to Which Agents' Questions Treated the Second Round as Continuous with the First Round

The fifth *Seibert* factor looks to "the degree to which the interrogators' questions treated the second round as continuous with the first." 542 U.S. at 615. Put simply, agents treated the post-*Miranda* interview as distinct from any unwarned

interactions. As Agent Passmore testified, Guerrero was not Mirandized at his home because they had made arrangements to attempt an interview later at the DEA office. (Suppression H'rg Tr. (Day One), R. 492 SEALED, #2395). And the agents did not preface the warned questioning by referring back to Guerrero's unwarned statements or otherwise attempt to exploit Guerrero's unwarned statements to obtain warned repetitions of those same statements. *Compare* Tr. of May 2, 2019 Guerrero Statement, R. 252-2 SEALED, at 7-8, *with Seibert*, 542 U.S. at 605 (officer resumed questioning immediately after *Miranda* warnings with the observation that "we've been talking for a little while about what happened on Wednesday the twelfth, haven't we?").[8]

***

---

[8] Guerrero points to Agent Hicks' statement that he did not know "if they did this then, but [he will] do it now," and argues that indicated a continuation between the warned and unwarned questioning. (Appellant Br. 26). In context, though, that statement clearly refers back to Guerrero's prior arrest three years ago, not to any questioning earlier that day:

> **Agent Hicks**: Okay. All right. Have you ever been arrested before?
>
> **Mr. Guerrero**: Yeah, three years ago.
>
> **Agent Hicks**: Okay. I don't know if they did this then, but I'll do it [*i.e.*, provide *Miranda* warnings] now. . . .

(Tr. of May 2, 2019 Guerrero Statement, R. 252-2 SEALED, at 7).

In sum, the first, second, and fifth factors firmly favor the government. The third factor largely favors the government as well. The fourth factor (continuity of police personnel) is the only one that favors Guerrero. On balance, then, even if the Court tallies the *Seibert* plurality factors, they merely reinforce the conclusion that the *Miranda* warnings were effective in this case. *See Woolridge*, 64 F.4th at 762 (explaining that the *Seibert* factors did not suggest a *Miranda* violation where "[s]ome factors partially weigh[ed] in [the defendant's] favor" but "others clearly [did] not").

**F.      Any Error in Admitting Guerrero's Post-Arrest Statements was Harmless.**

Even if this Court were to find that Guerrero's statements were erroneously admitted at trial, any such error was harmless beyond a reasonable doubt.

The admission of an involuntary confession is subject to harmless-error analysis. *Arizona v. Fulminante*, 499 U.S. 279, 308 (1991). A constitutional error is harmless if it "appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *United States v. Zakhari*, 85 F.4th 367, 378 (6th Cir. 2023) (quoting *Neder v. United States*, 527 U.S. 1, 15 (1999)). On at least one occasion, this Court has refrained from deciding a "*Miranda*-in-the-middle" issue where the statement at issue was harmless beyond a reasonable doubt. *United States v. Barahona-Sales*, 524 F. App'x 235, 239 (6th Cir. 2013).

Guerrero argues that, to the extent this Court may find a violation of his Sixth Amendment right to counsel, that error would be structural and not subject to harmless-error review. (Appellant Br. 30-31). That is wrong. The Supreme Court has "permitted harmless error analysis . . . where the evil caused by a Sixth Amendment violation is limited to the erroneous admission of particular evidence at trial." *Satterwhite v. Texas*, 486 U.S. 249, 257 (1988). Thus, in *Milton v. Wainwright*, 407 U.S. 371 (1972), the Court "held the admission of a confession obtained in violation of *Massiah v. United States*, 377 U.S. 201 (1964), to be harmless beyond a reasonable doubt." *Satterwhite*, 486 U.S. at 257. This Court has likewise recognized that "*Massiah* violations are normally subject to harmless-error analysis." *Ayers v. Hudson*, 623 F.3d 301, 317 n.12 (6th Cir. 2010) (citing *Milton*, 407 U.S. 371). Accordingly, harmless-error review applies to all of Guerrero's claimed errors here.

Under harmless-error review, it is clear that any conceivable error in admitting Guerrero's statements at trial was harmless beyond a reasonable doubt. Some cases may rise and fall on the defendant's confession. But this is not one. The instant case involved evidence that, on its own, proved each count beyond a reasonable doubt. More specifically, and as discussed in greater detail below, the investigation included Title III interceptions of wire (phone calls) and electronic (text messages) communications on two of Guerrero's phones. At trial, evidence from the wire

helpfully bookended more traditional investigative measures such as controlled buys, package interceptions, and walled-off traffic stops. Two of Guerrero's co-conspirators also testified as government witnesses at trial, contextualizing the intercepted communications and providing insider perspectives into the drug and money laundering conspiracies. This argument was borne out in the record at trial, as detailed below. In other words, the proof at trial did not hinge on Guerrero's statements at the interview—it was overwhelming even without them.

***Count Three—Distribution of 50 grams or more of methamphetamine.*** Government's Trial Exhibits 1 through 4 were controlled phone call recordings between a confidential source and Guerrero, in which the details of a methamphetamine purchase were discussed. (Trial Tr. (Vol. 1A), R. 497, #2643-48). Agents subsequently used the confidential source to conduct a controlled purchase of approximately 433 grams of methamphetamine from Guerrero on July 16, 2018. (*Id.* at #2641). Government's Trial Exhibits 7 through 10 were video recordings from the controlled buy. (*Id.* at #2657-59). The recordings only briefly and partially captured Guerrero's face, but screenshots in Government's Trial Exhibits 11 and 12 clearly showed a portion of Guerrero's face and his tattoo. (*Id.* at #2662-65). The methamphetamine was admitted as Government's Trial Exhibit 14, and its identity and weight were confirmed via laboratory testing as documented in Government's Trial Exhibit 15. (*Id.* at #2666-68; Trial Tr. (Vol. 3), R. 500, #3066-69). Collectively,

this evidence proved Count Three of the Indictment (distribution of 50 grams or more of methamphetamine) beyond a reasonable doubt.

*Count Four—Possession with intent to distribute, and distribution of, cocaine.* Government's Trial Exhibits 24 through 33 were intercepted text messages between Guerrero and co-defendant/co-conspirator Victor Rosas Diaz, in which the two arranged a distribution of cocaine from Guerrero to Diaz. (Trial Tr. (Vol. 1A), R. 497, #2689-95). Government's Trial Exhibits 34 and 36 were intercepted phone calls between Guerrero and Diaz regarding the same planned transaction. (*Id.* at #2695-98). On September 17, 2018, agents stopped Diaz in his vehicle immediately following the transaction and seized the cocaine. (*Id.* at #2700-02). The cocaine was admitted at trial as Government's Trial Exhibit 39, and its identity and weight was confirmed via laboratory testing reflected in Government's Trial Exhibit 40. (*Id.* at #2706; Trial Tr. (Vol. 3), R. 500, #3069-70). Collectively, this evidence proved Count Four of the Indictment (possession with intent to distribute and distribution of cocaine) beyond a reasonable doubt.

*Count Five—Attempted possession with intent to distribute 500 grams or more of cocaine.* Government's Trial Exhibits 41 through 72 were intercepted calls and texts between Guerrero and his co-conspirators (and the attendant transcripts, which were shown to the jury but not entered into evidence) arranging the shipment of two packages of cocaine to Nashville using a mail carrier service. (Trial Tr. (Vol.

2), R. 499, #2816-23, 2826-36, 2838-44, 2847-49, 2851-54). The packages were intercepted by law enforcement on or about October 6, 2018. (*Id.* at #2854). They were found to contain a total of almost two kilograms of cocaine. (*Id.*). The interrupted delivery concerned Guerrero and his co-conspirators, who discussed the missing packages and the need to get new phones on the wire calls. (*Id.* at #2852-54). The cocaine (from both packages) was admitted as Government's Trial Exhibits 75 and 77, and its identity and weight were confirmed via laboratory testing as documented in Government's Trial Exhibits 76 and 78. (*Id.* at #2856-57; Trial Tr. (Vol. 3), R. 500, #3084-88). Collectively, this evidence proved Count Five of the Indictment (attempted possession with intent to distribute 500 grams or more of cocaine) beyond a reasonable doubt.

***Count Six—possession with intent to distribute, and distribution of, 100 grams or more of heroin.*** Government's Trial Exhibit 82 was a surveillance video from a mail carrier service showing Guerrero's co-defendant/co-conspirator Odett Suarez dropping off a package to be shipped. (Trial Tr. (Vol. 2), R. 499, #2859-61). In an intercepted text message (Government's Trial Exhibit 123), Guerrero had sent an address to Suarez to list as the intended recipient. (*Id.* at #2864-65). The package, which contained approximately 243 grams of heroin, was intercepted by law enforcement on or about October 30, 2018. (*Id.* at #2858-59). Suarez testified that she was instructed by Guerrero to take the package and mail it to the address he had

sent to her. (Trial Tr. (Vol. 3), R. 500, #2962). The heroin was admitted as Government's Trial Exhibit 84, and its identity and weight were confirmed via laboratory testing as documented in Government's Trial Exhibit 85. (Trial Tr. (Vol. 2), R. 499, #2866; Trial Tr. (Vol. 3), R. 500, #3071-72). Collectively, this evidence proved Count Six of the Indictment (possession with intent to distribute and distribution of 100 grams or more of heroin) beyond a reasonable doubt.

***Count Seven—Possession with intent to distribute, and distribution of, 100 grams or more of heroin.*** Government's Trial Exhibit 87 was a recorded phone call between the confidential source and Guerrero, in which a sale of a kilogram of heroin from Guerrero (via his cousin and co-defendant/co-conspirator Jesus Hernandez) to the confidential source was arranged. (Trial Tr. (Vol. 2), R. 499, #2869, 2874). There were also several recorded phone calls between the confidential source and Hernandez (Government's Trial Exhibits 86, 88-90) coordinating the transaction. (*Id.* at #2868-71, 2873-75, 2877-78). In a controlled buy on November 30, 2018, an unknown male delivered heroin to the confidential source and an undercover ATF agent in a store parking lot. (Trial Tr. (Vol. 3), R. 500, #3050-51). Agent Hicks testified that Guerrero did not make the delivery himself, but his vehicle was spotted by the surveillance team in the parking lot at the time of the controlled buy. (Trial Tr. (Vol. 2), R. 499, #2875). In addition to the calls setting up the transaction, there was a recorded follow-up call between the confidential source and Guerrero

immediately after the buy (Government's Trial Exhibit 91). (*Id.* at #2872-73). Unbeknownst to Guerrero, Hernandez had been pulled over after the controlled buy, and agents found the gas can with the fake money that they had used to purchase the heroin. (*Id.* at #2878). The heroin was admitted as Government's Trial Exhibit 96, and its identity and weight were confirmed via laboratory testing as documented in Government's Trial Exhibit 97. (*Id.* at #2882-83; Trial Tr. (Vol. 3), R. 500, #3073-74). Collectively, this evidence proved Count Seven of the Indictment (possession with intent to distribute and distribution of 100 grams or more of heroin) beyond a reasonable doubt.

***Count Eight—Money laundering conspiracy.*** Government's Trial Exhibit 45 was an intercepted phone call between Guerrero and co-conspirator/co-defendant Eduardo Ceballos, in which the two discuss making a deposit to "the American" or "the horse." (Trial Tr. (Vol. 2), R. 499, #2822-23; Trial Tr. (Vol. 3), R. 500, #3017-18). Ceballos explained in his testimony at trial that these were terms he and Guerrero used to launder money—"the American" or "Americano" referred to Bank of America, while "the horse" referred to Wells Fargo, which used to have a horse as part of its logo. (Trial Tr. (Vol. 3), R. 500, #3017-18). Additionally, following the controlled purchase on July 16, 2018, clear surveillance video from Bank of America (Government's Trial Exhibit 125) shows Guerrero at the ATM as he deposited $3,920 into an account belonging to Ceballos's relative. (Trial Tr. (Vol. 1A), R. 497,

#2676-79). This was corroborated by bank records for the relative's account (Government's Trial Exhibit 18), which reflected the deposit. (*Id.* at #2674-75, 2678-79; Trial Tr. (Vol. 3), R. 500, #3018). Ceballos testified that he supplied drugs to Guerrero, and Guerrero paid his debts by depositing money into these bank accounts. (Trial Tr. (Vol. 3), R. 500, #2997, 3017-19). Collectively, this evidence proved Count Eight of the Indictment (conspiracy to commit money laundering) beyond a reasonable doubt.

***Counts One and Two—Drug conspiracies.*** With regard to the two drug conspiracies charged in Counts One (cocaine) and Two (heroin), the evidence described above establishes each conspiracy, and Guerrero's participation in the conspiracies, beyond a reasonable doubt.

*** 

In short, the value of the intercepted communications and recorded calls with the confidential source in this case cannot be overstated. While a coerced statement to law enforcement could potentially be unreliable, Guerrero's recorded conversations with his co-conspirators regarding their criminal activities carried no such risk, because he was unaware that law enforcement was listening. Guerrero's intercepted calls and text messages, and the recorded controlled calls with the confidential source, were all front and center throughout the government's case-in-chief at trial, and that evidence does not even take into account the photos and videos

of Guerrero engaging in some of the criminal conduct and the testimony of cooperating co-conspirators. Guerrero's statements to law enforcement, while helpful, were merely corroborative. Any error in admitting the statements was harmless beyond a reasonable doubt.

## II.    THE SEARCH OF GUERRERO'S CELLPHONES DID NOT VIOLATE THE FOURTH AMENDMENT.

### A. <u>Standard of Review</u>

In the context of a motion to suppress based on a claimed Fourth Amendment violation, this Court reviews factual findings for clear error and legal conclusions *de novo*. *United States v. Stevenson*, 43 F.4th 641, 644 (6th Cir. 2022).

Here, Guerrero challenges the district court's factual finding that he consented to the search of his cell phones. (Appellant Br. 36-44). In a case about the voluntariness of consent, the reviewing court asks whether an individual's actions adequately demonstrate consent and whether other factors contaminated that consent. *United States v. Blomquist*, 976 F.3d 755, 758-59 (6th Cir. 2020). "Since consent is a question of fact," this Court "look[s] at the evidence in the light most favorable to the government and reverse[s] only for clear error." *Id.* at 758. This Court "will uphold a finding of consent to a warrantless search unless [it is] left with a 'definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *United States v. Worley*, 193 F.3d 380, 384 (6th Cir. 1999)).

Testimony presented at a suppression hearing is viewed in the light most favorable to the district court's conclusions. *Stevenson*, 43 F.4th at 644 (citing *United States v. May-Shaw*, 955 F.3d 563, 566 (6th Cir. 2020) and *United States v. McCraney*, 674 F.3d 614, 616-17 (6th Cir. 2012)). "[A] denial of a motion to suppress will be affirmed on appeal if the district court's conclusion can be justified for *any* reason." *Moorehead*, 912 F.3d at 966 (emphasis added) (quoting *United States v. Pasquarille*, 20 F.3d 682, 685 (6th Cir. 1994)).

### B. <u>Argument</u>

There is no dispute in this case about what Guerrero and the agents said during the interview at the courthouse. The district court reprinted the colloquy between the agents and Guerrero verbatim. The transcript of the interview is also in the record in text and video format. (Tr. of May 2, 2019 Guerrero Statement, R. 252-2 SEALED; Suppression H'rg Tr., R. 492 SEALED, #2381 at Exhibits 11-12). Guerrero said that the agents could look through the flip phone, (Suppression Mem. and Order, R. 410, #2076 (quoting transcript)), and then gave the agents the passcode for his smartphone after signing the written consent form for both phones in his first language, Spanish, (Suppression Mem. and Order, R. 410, #2077-78 (also quoting transcript)). On these simple facts, from the perspective of the agents, Guerrero's consent was knowing and voluntary.

Courts considering the voluntariness of consent examine the characteristics of the accused (age, intelligence, education, and comprehension of rights), the details of detention (including length and nature), the use of coercive or punishing conduct by police, and indications of more subtle coercion. *United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998). Here, these factors all point toward voluntary consent.

***Characteristics of the accused.*** Here, Guerrero was almost 30 years old and had been in the United States for more than ten years. (Suppression Mem. and Order, R. 410, #2070, 2079). He had been recorded engaging in drug activity with numerous others in English and communicated during the entire interview in English. (Tr. of May 2, 2019 Guerrero Statement, R. 252-2 SEALED; Suppression H'rg Tr., R. 492 SEALED, #2389-91, 2394, 2398, 2439, 2443-44, 2445, 2447, 2449, 2459-61, 2489; Suppression H'rg Tr., R. 492 SEALED at Exhibits 1-6, 9-12).

"In determining whether an individual has sufficient comprehension of English to provide voluntary consent, courts examine his ability to interact intelligently with the police." *United States v. Zapata*, 180 F.3d 1237, 1242 (11th Cir. 1999) (assessing caselaw). Guerrero was able to interact with the police intelligently in English from the moment he was arrested, alerting them to the presence of firearms in his house and outlining his concerns about his family in Mexico. Consent from an individual whose first language is not English can still be obtained when the individual understands what they are doing. *See, e.g., United*

*States v. Garcia*, 834 F. App'x 134, 140 (6th Cir. 2020) ("In particular, the court noted that Miguel was studying for his GED, understood English, was not under the influence of drugs, alcohol, or medications, and did not have medical or mental issues that would have affected his consent.") (affirming denial of suppression motion); *United States v. Valdez*, 147 F. App'x 591, 596 (6th Cir. 2005) ("The record establishes that Valdez could understand, and interact with, Trooper Moore. When asked to produce his license, Valdez readily complied. Valdez also appropriately responded to questions about his destination and his relationship with Lopez. These facts demonstrate that Valdez understood English well enough to give consent."); *United States v. Gutierrez-Mederos*, 965 F.2d 800, 803 (9th Cir. 1992) (finding that "other evidence affirmatively indicates that appellant understood the questions," and affirming finding of voluntariness despite testimony of linguistics expert where defendant conversed in English with trooper).

Although English was not Guerrero's first language, he conversed in English with the officers in this case for hours. He conversed freely in English on all the recorded calls and with an informant who spoke no Spanish. (Tr. of May 2, 2019 Guerrero Statement, R. 252-2 SEALED; Suppression H'rg Tr., R. 492 SEALED, #2389-91, 2394, 2398, 2439, 2443-44, 2445, 2447, 2449, 2459-61, 2489; Suppression H'rg Tr., R. 492 SEALED at Exhibits 1-6, 9-12). And the consent form he signed was in Spanish, his native language. The signed consent form, in

particular, strongly supports the conclusion that Guerrero's consent was voluntary. *United States v. Boone*, 245 F.3d 352, 362 (4th Cir. 2001) ("Written consent supports a finding that the consent was voluntary."); *United States v. Rojas*, 783 F.2d 105, 108 (7th Cir. 1986) (affirming district court's finding consent was voluntary despite "at least a slight language barrier" where defendant signed written consent form to search in Spanish and told officers he spoke English during search of his home); *United States v. Gaviria*, 775 F. Supp. 495, 498 (D.R.I. 1991) ("The presence of a signed, written consent form serves to significantly bolster the claim of voluntariness of consent, and provides an additional means of assurance that the non-native speaker understands what his consent means.") (granting suppression motion where no one explained defendant's rights to him "in even the most cursory manner in Spanish OR in English" (emphasis in original)); *see also North Carolina v. Butler*, 441 U.S. 369, 373 (1979) (written waiver is usually strong proof of validity of waiver).

This is not a case where the government's burden is heavier to show consent with "a foreigner who does not readily speak and understand the English language." *Cf. United States v. Hernandez*, 443 F. App'x 34, 40 (6th Cir. 2011) (quoting *Kovach v. United States*, 53 F.2d 639 (6th Cir. 1931)). Guerrero spoke English well enough to communicate with the agents. *See United States v. Zuniga*, 613 F. App'x 501, 508 (6th Cir. 2015) (consent voluntary where defendant understood conversations in

English and could respond to questions "for his insurance and driver's license, where he was coming from and going, and the type of work that he did") (affirming denial of suppression motion); *United States v. Ayoub*, 498 F.3d 532, 542 (6th Cir. 2007) (consent voluntary where individual consenting could communicate in English without assistance); *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1519 (6th Cir. 1988) (similar); *United States v. Lopez-Guzman*, 246 F. Supp. 2d 1155, 1161-62 (D. Kan. 2003), *aff'd*, 145 F. App'x 627 (10th Cir. 2005) ("Defendant responded to several of Sergeant Rule's requests made in English, without any Spanish counterparts, such that the court is persuaded that defendant understood English sufficiently to consent to the officer's request to search the vehicle."). Any language barrier here did not prevent Guerrero from executing a drug buy with an informant who spoke no Spanish. Any language barrier here did not prevent Guerrero from alerting the officers to the presence of firearms in his home and conversing with the officers for ninety minutes in English. And any language barrier here did not prevent Guerrero from voluntarily consenting to the search of his cellphones both orally in English and in writing in his native Spanish.

**_Details of Detention._** The interview was 90 minutes, cordial, recorded by audio and video, and Guerrero was not under the influence during the interview. (Suppression Mem. and Order, R. 410, #2066, 2079). The district court reviewed the recording of the interview, heard testimony from the agents, and concluded that they

"never drew their weapons, made no threats, did not raise their voices and engaged with Guerrero in a serious but cordial manner." (*Id.* at # 2079). That factual finding was not clearly erroneous.

***Absence of Coercion.*** Although the officers may have asked for consent to search his phones more than once, they were simply stating they intended to procure a search warrant absent consent and engaging in a colloquy with Guerrero. "[T]hreatening a thorough but lawful search—even inartfully—is not by itself impermissible." *United States v. Jacobs*, 63 F.4th 1055, 1060 (6th Cir. 2023).

In the consent context, "the defendant must show more than a subjective belief of coercion, but also some objectively improper action on the part of the police." *United States v. Crowder*, 62 F.3d 782, 787 (6th Cir. 1995). Here, there is no objectively improper conduct. The interview was cordial and professional. The agents may have repeated themselves but repeating oneself or asking a question more than once is not objectively improper. Guerrero's English may not have been perfect, but from the agents' perspective (having heard Guerrero conversing in English many times before, having heard him identify where his guns were, and talking to him for 90 minutes in English), it was good enough to understand what was happening. *Garner v. Mitchell*, 557 F.3d 257, 263 (6th Cir. 2009) ("The underlying police-regulatory purpose of *Miranda* compels that these circumstances be examined, in their totality, primarily from the perspective of the police."); *see*

*also Ramamoorthy*, 949 F.3d at 965 (same principle); *Villa-Castaneda*, 755 F. App'x at 516 (similar).

Guerrero argues that the agents coerced him into giving consent because he told the agents he wanted to "check with somebody" before ultimately giving consent. (Appellant Br. 37-38). But, as the district court found, Guerrero may have initially "evaded giving consent by asking the agents to 'check with someone,' but he did not clearly refuse consent." (Suppression Mem. and Order, R. 410, #2079). That finding was not clearly erroneous.

In any event, Guerrero ultimately signed a Spanish consent form. Guerrero now claims he did not understand the form. (Appellant Br. 40 n.5). But courts have rejected similar arguments regarding the translation of Spanish words. *United States v. Hernandez*, 443 F. App'x 34, 40 (6th Cir. 2011) (collecting cases). And the argument rings especially hollow here, where the simple Spanish form Guerrero signed was a single page and plainly would not have required extensive time to review. (*See* Signed Consent Form, R. 322-1, #1501).

Guerrero gestures toward an argument that, even if he consented, the scope of the search exceeded his consent. (Appellant Br. 39). As the district court correctly recognized, Guerrero consented to the search of both phones and signed a written waiver in his native language consenting to searches of both those phones. (Suppression Mem. and Order, R. 410, # 2080). The question is what a reasonable

person would have understood by the exchange between the officers and a suspect. *United States v. Lucas*, 640 F.3d 168, 177 (6th Cir. 2011); *see also United States v. Sarli*, 913 F.3d 491, 495 (5th Cir. 2019) ("Where there is ambiguity regarding the scope of a consent, the defendant has the responsibility to affirmatively limit its scope."). Objective reasonableness is measured from the perspective of the agents. *United States v. Garrido-Santana*, 360 F.3d 565, 576 (6th Cir. 2004) ("Therefore, it was objectively reasonable for [Patrolmen] Lomax and Lane to have believed that defendant's general consent to search the vehicle encompassed consent to search the vehicle's gas tank."). Here, a reasonable person in the agents' shoes would have understood that, by providing the passcode to a smartphone and signing a written consent form authorizing the search of the "Black Smart Phone," (*see* Signed Consent Form, R. 322-1, #1501), Guerrero indicated that the scope of his consent was broad. Guerrero provided the passcode after being asked how to unlock the smartphone. (Suppression Mem. and Order, R. 410, #2078 (quoting transcript)).

A reasonable person would generally understand that providing access to a cellphone means consent to a full search of the phone. *United States v. Gallegos-Espinal*, 970 F.3d 586, 592 (5th Cir. 2020) ("A typical reasonable owner of a cell phone would know that a cell phone contains extensive personal information and would understand that a 'complete' cell phone search refers not just to a physical examination of the phone, but further contemplates an inspection of the phone's

'complete' contents."); *United States v. Thurman*, 889 F.3d 356, 368 (7th Cir. 2018) ("A reasonable person may be expected to know that recently deleted information can be reconstructed on a cell phone."); *see also United States v. Barrett*, 750 F. App'x 19, 22 (2d Cir. 2018) ("Barrett having twice unlocked his phone and said 'OK' in handing it to Kruse, a reasonable person would not have had cause to believe that the search was limited in some way") (cleaned up), *partially vacated on other grounds*, 937 F.3d 126 (2d Cir. 2019).

In short, the district court found that Guerrero's "consent to search the cell phones was voluntary." (Suppression Mem. and Order, R. 410, #2080). Voluntariness is a question of fact and is thus reviewed only for clear error. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973) ("Voluntariness is a question of fact to be determined from all the circumstances[.]"); *United States v. Montgomery*, 621 F.3d 568, 572 (6th Cir. 2010) ("In reviewing consent determinations, we defer to the district court's findings and credibility determinations while construing the evidence in the light most favorable to the winner of the suppression motion—the government in this instance."). There is no indication from the district court's order that either agent was not credible. Indeed, the district court relied on their descriptions of the interview to make its findings in addition to the transcript. And Guerrero has not come close to explaining how the

district court committed clear error by finding that the signed Spanish-language consent form proved his consent.

Finally, for the same reasons articulated in **Section I.F** above, the content of Guerrero's cellphones was corroborative, not dispositive, in his conviction. Any error was harmless beyond a reasonable doubt. *United States v. Hardy*, 228 F.3d 745, 751 (6th Cir. 2000) ("In determining whether an error is harmless, the reviewing court 'must take account of what the error meant to [the jury], not singled out and standing alone, but in relation to all else that happened.'") (quoting *Kotteakos v. United States*, 328 U.S. 750, 764 (1946)) (affirming given government's presentation of sufficient other evidence to support conviction); *see also United States v. Dillard*, 648 F. App'x 564, 566 (6th Cir. 2016) (similar analysis).

## CONCLUSION

The district court's judgment should be affirmed.

> Respectfully submitted,
>
> ROBERT E. McGUIRE
> Acting United States Attorney
> Middle District of Tennessee
>
> */s/ Michael Tackeff*
> EMILY PETRO
> MICHAEL TACKEFF
> Assistant United States Attorneys
> 719 Church Street, Suite 3300
> Nashville, Tennessee 37203
> (615) 736-5151
>
> Attorneys for Plaintiff-Appellee

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that this brief contains 12,749 words, exclusive of the table of contents, table of authorities, and certifications, and therefore complies with the limitations on length of a brief set forth at Rule 32(a)(7)(B)(I) of the Federal Rules of Appellate Procedure.

*/s/ Michael Tackeff*
MICHAEL TACKEFF

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2025, I electronically filed the foregoing document with the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Michael Tackeff*
MICHAEL TACKEFF

**ADDENDUM**

**APPELLEE'S DESIGNATION OF
RELEVANT DISTRICT COURT DOCUMENTS**

Appellee, pursuant to 6th Cir. R. 28(c) and 6th Cir. R. 30(b), hereby designates the following relevant district court documents in the electronic record:

| Record Entry No. | Description of Document 3:22-cr-00311 | PageID# |
|---|---|---|
| 3 | Indictment | 3-6 |
| 151 | Motion Requesting a Change of Plea Hearing | 361 |
| 163 | Joint Motion to Enlarge Pretrial Motions Deadline | 398 |
| 249 | Motion to Suppress Statements | |
| 250 | Motion to Suppress Cell Phone Evidence | |
| 252 | Transcript of the May 2, 2019 Guerrero Statement | Sealed |
| 253 | Motion to Suppress Evidence Obtained Pursuant to Facebook Warrant | |
| 256 | Motion to Suppress Evidence obtained from Wiretaps | 921 |
| 320 | Response to Defendant's Motion to Suppress Statements | 1488 |
| 322 | Response to Defendant's Motion to Suppress Cellphone Evidence | 1496 |
| 322-1 | Signed Consent Form | 1501 |
| 353 | Order on Post-Hearing Briefs | 1731 |
| 362 | United States Post-Hearing Brief | Sealed |
| 366 | Defendant's Post-Hearing Brief | Sealed |

| Record Entry No. | Description of Document 3:22-cr-00311 | PageID# |
|---|---|---|
| 369 | United States Post-Hearing Reply | Sealed |
| 405 | Motion Cancelling Change of Plea | 405 |
| 410 | Suppression Memorandum and Order | 2055, 2057-2067, 2069-2078 |
| 452 | Criminal Minutes | 2242 |
| 457 | Criminal Minutes | 2252 |
| 458 | Verdict Form | 2253 |
| 486 | Criminal Minutes | 2361 |
| 488 | Judgment | 2363-2370 |
| 490 | Notice of Appeal | 2375 |
| 492 | Suppression Hearing Transcript (Day One) | 2379, 2381, 2384, 2388-2399, 2402-2403, 2405-2406, 2438-2439, 2443-2444, 2446-2449, 2459-2461, 2463-2465, 2468, 2489, |
| 493 | Suppression Hearing Transcript (Day Two) | 2528-2529, 2572, 2575, 2579, 2582, |
| 497 | Trial Transcript Vol. 1A | 2642-2648, 2657-2659, 2662-2665, 2666-2668, 2674-2679, 2689-2698, 2700-2702, 2706 |

| Record Entry No. | Description of Document 3:22-cr-00311 | PageID# |
|---|---|---|
| 499 | Trial Transcript Vol. II | 2816-2823, 2826-2836, 2873, 2838-2844, 2847-2849, 2851-2854, 2856-2857, 2858-2861, 2864-2866 |
| 500 | Trial Transcript Vol. III | 2962, 297, 3017-3019, 3050-3051, 3066-3074, 3084-3088, |
| 502 | Sentencing Hearing Transcript | Sealed |
| 517 | Pre-Sentence Report | Sealed |